**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

LEONARD K. BROWN,                         :
    Plaintiff,                          :
                                         :
    v.                                   :
                                         :
WINDHAM NORTHEAST SUPERVISORY            :
UNION (WNESU); AND LISA                  :    No. 2:05-CV-329
DUFRESNE; DENISE RANDALL; KEN            :
DUFORT; ROD LAWRENCE; SANDRA             :
STEVENS; RUSSELL CAPRON;                 :
TIMOTHY VINCENT; AND PIETRO              :
LYNN,                                    :
    Defendants.                         :
                                         :

**OPINION AND ORDER**

Leonard Brown brought this action following his resignation as superintendent of the Windham Northeast Supervisory Union ("WNESU"). His Amended Complaint asserts that the WNESU and the eight individual defendants wrongfully deprived him of procedural due process and other legal rights. Before the Court are three motions for summary judgment. For the reasons set forth below, the motion of defendants WNESU, Dufresne, Randall, Dufort, Lawrence, Stevens, Capron, and Vincent (collectively the "WNESU Defendants") (Doc. 39) is DENIED. The motion of defendants Dufresne, Randall, Dufort, Lawrence, Stevens, Capron, and Vincent (collectively the "Individual WNESU Defendants") (Doc. 56) is GRANTED IN PART and DENIED IN PART. The motion of defendant Lynn (Doc. 59) is GRANTED.

**BACKGROUND**

The following facts, which are presented in the light most favorable to Brown, are undisputed except where otherwise noted.

**A. The parties**

Brown served as superintendent of the WNESU, a school district in southeastern Vermont, from January 2003 until his resignation in May 2004.  As superintendent, he was responsible for the administration of the WNESU and its member school districts, one of which was the Athens-Grafton Joint Contract District (the "AG District").  Prior to becoming superintendent, Brown had served as assistant superintendent of the WNESU.  At the time of his resignation, he had worked in the Vermont educational system for a total of approximately 27 years.

During the period surrounding Brown's resignation, five of the individual defendants (Lisa Dufresne, Denise Randall, Ken Dufort, Rod Lawrence, and Sandra Stevens) were members of both the WNESU and AG District boards, and defendant Russell Capron was a member of the WNESU board.  Defendant Timothy Vincent was an insurance adjuster who was employed by a third-party claims administrator, Alternative Service Concepts, LLC ("ASC"), and who was working on behalf of the WNESU's insurer, the Vermont School Board Insurance Trust ("VSBIT").  The final defendant, Pietro Lynn, is an attorney who was retained by VSBIT to represent the WNESU during the period in question.

2

**B. The Doe Complaint and the Ritter Report**

In December 2004, an employee of the AG District identified by the pseudonym of "Jane Doe" filed a complaint (the "Doe Complaint"), accompanied by supporting attachments, with the WNESU and the AG District.  In her complaint, Doe alleged that Brown had sexually harassed her and that he had taken retaliatory adverse employment actions.  A copy of the Doe Complaint was made available to Brown, although he did not initially receive the supporting attachments.

After receiving the Doe Complaint, the WNESU and AG District boards jointly retained the services of an attorney, Susan Ritter, to conduct an investigation into Doe's allegations.  In addition, VSBIT retained Attorney Lynn to advise the WNESU concerning the matter.

As part of her investigation, Ritter reviewed the Doe Complaint and its supporting attachments, as well as a written response to the Doe Complaint that Brown had submitted.  She also interviewed Doe, Brown, and numerous other individuals.  In late March 2005, Ritter submitted a report to the WNESU and AG District boards summarizing her findings (the "Ritter Report").  The Ritter Report accepted Doe's allegations in part and rejected them in part.  Ritter concluded that a number of Brown's actions had violated the WNESU sexual harassment policy and that he had engaged in hostile and intimidating acts toward Doe.  However,

she also concluded that Brown's criticism of Doe's job performance had not constituted hostile or retaliatory behavior and that he had not take any tangible adverse employment actions against Doe.

On March 28, 2005, at Lynn's invitation, Brown and his attorney, John Paul Faignant, went to Lynn's office and viewed the Ritter Report.  Lynn indicated that if Brown or Faignant wished to respond to the Report, they could submit a written response.  On April 15, Faignant submitted a two-page response to Lynn.

## C. **The board deliberations and Brown's resignation**

On April 27, 2005, the WNESU and AG District boards met in joint session, considered the Ritter Report, and voted to accept its findings.  On April 29, Lynn wrote to Faignant stating that based on the Ritter Report, the WNESU intended to dismiss Brown for violation of WNESU policy and for conduct unbecoming a superintendent of schools.  Lynn's letter invited Brown and Faignant to a hearing on May 12 at which Brown could "present evidence and argument that he did not violate the sexual harassment policy, that he did not engage in conduct unbecoming a superintendent, and that he should not be terminated."  Letter of Pietro Lynn, Ex. E to Second Aff. of Pietro Lynn (Doc. 61).

On May 2, 2005, Lynn sent an e-mail to Faignant offering to provide him with a complete copy of the Doe Complaint, including

its supporting exhibits, and a copy of the Ritter Report.  Lynn
stated that Faignant and Brown would need to agree to keep the
documents confidential, to refrain from making copies, and to
return them to Lynn at the May 12 hearing.  Faignant did not
accept Lynn's offer, but instead objected to the offer's timing
and the conditions that Lynn had placed on it.  Lynn reiterated
his offer but received no response from Faignant.

The May 12 hearing began as a joint meeting of the WNESU and
AG District boards.  After Faignant objected to the presence of
AG board members who were not also members of the WNESU board,
those members left the meeting.  The WNESU board subsequently
went into executive session and heard evidence and arguments from
Brown concerning the Doe Complaint and the Ritter Report.  The
board adjourned the meeting without reaching a conclusion
regarding Brown's continued employment.  It held a second meeting
on May 17 and again failed to reach a decision.

On May 18, 2005, Lynn wrote to Faignant informing him that
the WNESU board intended to meet again on May 19 to make a final
decision.  Lynn's letter also stated:

> I have been authorized to inform you that the Board would
> be pleased to accept Mr. Brown's resignation within the
> next 24 hours.  If there is a need for formal action on
> Thursday, it is [board chairman Steve] Fine's sense that
> there may be a vote to terminate.  I am also authorized to
> inform you that the Board does not appear to be interested
> in a resolution which would include a buyout of Mr.
> Brown's contract.

E-mail of Pietro Lynn, Ex. L to Doc. 61.  Later on May 18,

Faignant wrote to Lynn that he would recommend that Brown "consider resigning on terms that include confidentiality, and less than a full buyout" of his contract.  E-mail of John Paul Faignant, Ex. M to Doc. 61.

On May 19, the WNESU board met again, with Lynn, Brown, and Faignant in attendance.  During the meeting, Lynn and Faignant engaged in discussions regarding a settlement of the matter, and an agreement (the "Settlement Agreement" or "Agreement") was drafted.  The Agreement stated, in full:

> Agreement Regarding Leonard Brown
>
> WNSU and Leonard Brown agree as follows:
>
> 1. Leonard Brown will terminate by mutual consent pursuant to his resignation his employment contract with WNSU, effective immediately.
>
> 2. WNSU will pay benefits j. through n. and full salary through September 15, 2005.
>
> 3. Leonard Brown and WNSU will execute mutual general releases.
>
> 4. WNSU will hold harmless and indemnify Leonard Brown to the extent there is insurance coverage for claims raised in the future against Brown arising from his employment at WNSU.

Settlement Agreement, Ex. 7 to Aff. of Pietro Lynn (Doc. 42). There is no evidence that the parties discussed what was intended by the phrase "full salary" during the negotiations.

Brown and WNESU board chairman Steve Fine signed the agreement.  Brown then signed a document entitled "Resignation and Termination of Contract," which stated:

> I, Leonard Brown, resign my position as the Superintendent
> of Schools of the Windham Northeast Supervisory Union
> pursuant to the Administrative Contract - Superintendent
> of Schools, dated September 22, 2004.  By resigning, I am
> invoking my right to terminate the contract.  I waive any
> right to insist on a writing that manifests WNSU's consent
> to termination of the Administrative Contract and
> acknowledge WNSU's consent to termination of the
> Administrative Contract.

Ex. 8 to Doc. 42.

    To date, Brown has not signed a general release as
contemplated by Paragraph 3 of the Settlement Agreement.
Although Lynn sent Faignant a proposed general release form on
November 3, 2005, see Ex. 11 to Doc. 42, Faignant and Brown
objected to the proposal and declined to return a signed copy.

**D. Brown's salary and the Settlement Agreement payments**

    At the WNESU, each fiscal year runs from July 1 to the
following June 30.  Brown's employment contract defined his
salary during the 2005 and 2006 fiscal years ("FY05" and "FY06")
as follows:

> **Salary** The Superintendent's salary for the period of
> January 1, 2004 to June 30, 2005, shall be $87,780 per
> annum.  The Superintendent's salary for the period of
> June[1] 1, 2005 to June 30, 2006, shall be at $90,413 per
> annum.  In no event shall the Superintendent's salary be
> less than 5% high [*sic*] than the next highest salaried
> employee in the WNESU.

Administrative Contract at 1, Ex. 1 to Aff. of Michael Ricci
(Doc. 43) ("Ricci Aff.").

-----

[1] Although the contract states "June 1, 2005," it appears that
the parties intended to refer to *July* 1, 2005, the first day of
the 2006 fiscal year.  The parties do not suggest otherwise.

The last sentence of this paragraph, providing that Brown's salary must be at least 5% higher than all other salaried employees, was known as the "compression clause."  During FY05, neither the WNESU nor Brown took any action to pursue an adjustment to Brown's salary under the compression clause.  As a result, prior to his resignation, Brown was receiving salary payments based on an annual salary rate of $87,780.

Pursuant to the Settlement Agreement, the WNESU continued making biweekly "salary" payments after Brown's resignation. Because Brown resigned approximately six weeks before the end of FY05, the first three payments fell within FY05, and the WNESU continued to base those payments on an annual salary rate of $87,780.  Accordingly, the salary and post-resignation payments that Brown received for FY05 totaled $87,780, not counting benefits.  Beginning in July 2005, the Settlement Agreement payments were increased to reflect the FY06 salary level of $90,413 indicated in Brown's contract.  The WNESU continued making payments through September 15, 2005, as contemplated by Paragraph 2 of the Agreement.

In all, taking into account the biweekly payments and additional contributions that were made toward Brown's benefits, the WNESU paid a total of $34,558.01 in post-resignation payments pursuant to the Agreement.  Brown retained these payments and has made no effort to return them.

8

**E. Brown's compression clause request**

On September 7, 2005, approximately two months into FY06, Brown wrote to the WNESU's business manager, Michael Ricci, requesting that his FY05 salary be adjusted pursuant to the compression clause.  See Letter of Leonard Brown, Ex. 3 to Doc. 43.  According to Brown, he had followed a similar practice in prior years, submitting requests for additional payment under the compression clause "at the end of the year in question."  Aff. of Leonard Brown ¶ 23 ("Brown Aff."), Ex. 25 to Statement of Disputed Material Facts (Doc. 55).

In his letter to Ricci, Brown suggested that the compression clause had been triggered by the fact that another WNESU employee had received a FY05 salary that was within 5% of his own salary. He also stated that he was planning to retire from the Vermont education system effective October 1, 2005, and that the Vermont State Teachers Retirement System would need to be notified of his amended salary by September 30 in order to ensure the accuracy of his pension payments.

Although Brown's letter to Ricci did not identify the employee whose salary he believed to have triggered the compression clause, the parties agree that he was referring to WNESU employee Marcy Henry, who received salary payments totaling $90,000 in FY05.  During that fiscal year, Henry had received $78,000 for serving in her regular position as principal of Bellows Falls Middle School.  Pursuant to an addendum to her

contract, she had also received a one-time salary of $12,000 after agreeing to serve as interim principal of Cherry Hill School.  As superintendent, Brown had signed off on Henry's original contract in May 2004 and on the addendum in September 2004.

On October 2, 2005, Lynn wrote to Brown's counsel stating that the WNESU did not believe that Brown was entitled to any payments beyond what he had already received.  See E-mail of Pietro Lynn, Ex. 9 to Doc. 42.  The WNESU took the position that the compression clause would only have been effective if Brown were still employed by the WNESU, and that the compression clause had not been incorporated into the Settlement Agreement.  To date, the WNESU has not complied with the request in Brown's September 7 letter.

## F. **The current action**

On December 1, 2005, Brown filed suit against the WNESU Defendants in Windham Superior Court, and the WNESU Defendants removed the case to this Court on December 21.  On December 23, Brown amended his complaint to add Attorney Lynn as a defendant.

The Amended Complaint raises numerous allegations against the defendants.  Broadly speaking, it alleges that they engaged in a fraudulent scheme to violate Brown's rights and remove him from his position as superintendent, and that they committed numerous violations of his procedural due process and contractual rights.  Among the allegations are that the WNESU and AG District

10

boards acted improperly by jointly considering the Doe Complaint and pursuing disciplinary action against Brown, even though the AG District was not Brown's employer, and that members of the AG board "padded" the WNESU board with anti-Brown votes.  The Amended Complaint also alleges that Vincent and Lynn engineered a deal with Jane Doe whereby they agreed to terminate Brown in order to limit VSBIT's financial exposure arising out of the Doe Complaint.  It alleges that the defendants who are board members failed to recuse themselves despite having previously demonstrated bias against Brown.  It alleges that the defendants failed to provide Brown with written notice of the charges against him, and that he was coerced into resigning and signing the Settlement Agreement.  It alleges that the WNESU breached the Agreement by failing to pay Brown's "full salary."  It also makes allegations of misconduct by various defendants in connection with the Keeny Trust, a charitable trust established by Brown's aunt.

The Amended Complaint asserts fifteen counts.  Count I alleges that the WNESU violated its obligation of good faith and fair dealing in connection with Brown's employment contract.  Count II alleges that the individual defendants wrongfully interfered with the employment contract.  Count III alleges that the WNESU constructively terminated Brown.  Count IV alleges that all of the defendants violated Brown's rights and privileges

under 42 U.S.C. § 1983.[2]  Counts V and VI allege that all defendants conspired to violate and did violate Brown's contractual, statutory, and constitutional rights.  Count VII alleges that the individual defendants knowingly violated Brown's well established rights.  Count VIII alleges that the WNESU breached Brown's employment contract.  Count IX alleges that the WNESU fraudulently induced Brown into resigning by promising him "full salary" under the Settlement Agreement and that he is excused from performing under the Agreement by the WNESU's failure to pay his full salary.  Count X alleges that the WNESU breached the Settlement Agreement by failing to pay Brown's full salary.  Count XI alleges that the WNESU violated its obligation of good faith and fair dealing in connection with the Settlement Agreement.  Count XII alleges that punitive damages are warranted against all defendants.  Count XIII alleges that all defendants committed a number of actions which fraudulently deprived Brown of his rights.  Count XIIII [*sic*] alleges that all defendants are liable for Brown's attorneys' fees.  Finally, Count XV alleges that Vincent and Lynn violated "their and VSBIT's and ASC's duties of good faith and fair dealing with Plaintiff."

Currently before the Court are motions for summary judgment filed by the WNESU Defendants, the Individual WNESU Defendants,

---

[2] Although the Amended Complaint makes reference to "28 U.S.C. § 1983," the Court presumes that Brown intended to cite the corresponding section of Title 42, which relates to deprivations of civil rights.

and Lynn.[3]

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  A court may not grant summary judgment if a disputed fact exists that might affect the outcome of the suit under controlling substantive law.  Id. at 248.  The burden is on the moving party to demonstrate the absence of a genuine issue of material fact, and in considering the motion, the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party.  Braham v. Clancy, 425 F.3d 177, 181 (2d Cir. 2005).  The nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading," but must "set forth

---

[3] It is not entirely clear that defendant Vincent intended to join in the motions of the WNESU Defendants and the Individual WNESU Defendants.  Vincent's name appears on both motions.  See Doc. 39 at 1; Doc. 56 at 1 (both stating, "NOW COME defendants . . . [names omitted] and Timothy Vincent").  However, it appears to have been omitted in certain other locations in the motions and their accompanying memoranda.  Nevertheless, because of the inclusion of Vincent's name, and because the arguments raised in both motions apply with equal force to the claims against Vincent and the claims against the other individual defendants, the Court has assumed that Vincent did intend to join in.  Accordingly, as discussed below, Vincent is entitled to dismissal of all but two of the claims against him.

specific facts showing that there is a genuine issue for trial."
Fed. R. Civ. P. 56(e).

### DISCUSSION

### I. THE WNESU DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In the first motion for summary judgment before the Court,
the WNESU Defendants argue that Brown's claims against them are
barred by his promise in Paragraph 3 of the Settlement Agreement
to execute a general release.  Brown responds that he is not
obligated to provide any such release because the WNESU has
breached the Agreement, excusing Brown from performance of his
own obligations.[4]

A breach of contract by one party may entitle the other
party to be discharged from further performance.  Cass-Warner
Corp. v. Brickman, 126 Vt. 329, 337, 229 A.2d 309, 315 (1967);
Rioux v. Ryegate Brick Co., 172 Vt. 148, 47 A. 406, 408 (1900).
However, to excuse performance, the first party's breach must go
"to the essence of the contract[.]"  Rioux, 47 A. at 408.  Put
another way, "when a contract has been partly performed by one
party, and the other has derived a substantial benefit therefrom,
the latter cannot refuse to comply with its terms simply because

_____

[4] Brown also argues that even if he is not excused from
performance, the Agreement only requires him to release the
WNESU, not the individual defendants, and that it does not apply
to all of the claims in his complaint.  Because the Court
concludes that Brown has raised an issue of material fact as to
whether he is bound by the Agreement at all, it is unnecessary to
consider these arguments.

the former fails of complete performance." <u>Tichnor Bros. v.</u>
<u>Evans</u>, 92 Vt. 278, 102 A. 1031, 1032 (Vt. 1918).  Accordingly,
Brown must demonstrate that there are issues of fact not only as
to whether WNESU breached the Agreement, but also as to whether
the breach was so serious that it went to the essence of the
Agreement.

**A.  <u>Whether the WNESU breached the Settlement Agreement</u>**

Brown contends that the WNESU breached the Agreement by
failing to fulfill its obligation to pay his "full salary."
Under Paragraph 2 of the Agreement, the WNESU undertook to "pay
benefits j. through n. and full salary through September 15,
2005."  Brown takes the position that the term "full salary" is a
reference to the definition of his salary in his employment
contract, and that the compression clause is an integral part of
that definition.  It follows, he argues, that because WNESU
employee Marcy Henry received a FY05 salary of $90,000, Brown was
entitled under the compression clause to 105% of Henry's salary,
or $94,500.  Under this interpretation, the WNESU deprived Brown
of his "full salary" for FY05 because it made payments totaling
only $87,780.  The WNESU Defendants dispute Brown's
interpretation, arguing that the parties never contemplated that
the Settlement Agreement would incorporate the compression clause
and therefore that Brown's "full salary" for FY05 was $87,780.

Under Vermont law, contract interpretation is a matter for
the court unless the contract is ambiguous.  <u>See</u> <u>Rogers v. Wells</u>,

174 Vt. 492, 494, 808 A.2d 648, 651 (2002) ("Absent ambiguity, contract interpretation is a matter of law."); United Ry. Supply & Serv., Ltd. v. Boston & Me. Corp., 148 Vt. 454, 457, 535 A.2d 325, 327 (1987) ("[W]hen the court determines that a contractual provision is ambiguous, the intent of the parties becomes a question for the trier of fact.").  "A provision in a contract is ambiguous only to the extent that reasonable people could differ as to its interpretation."  Isbrandtsen v. North Branch Corp., 150 Vt. 575, 577, 556 A.2d 81, 83 (1988).

Applying these principles, the Court concludes that Brown has raised an issue of fact as to whether the WNESU breached the Settlement Agreement.  Brown's interpretation--that the Agreement entitles him to his full salary as defined by his employment contract--is reasonable.  The Agreement does not merely set forth a dollar figure that Brown is to receive; instead, it requires that the WNESU pay his "full salary," and his salary, as defined in his contract, includes the compression clause.  Even if the WNESU Defendants' interpretation were also a reasonable one, that would only establish that the Agreement is ambiguous, and the question of interpretation would belong before a jury.

The WNESU Defendants argue that a finding of ambiguity can be avoided by looking to extrinsic evidence of the facts and circumstances surrounding the making of the Agreement.  They note that the discussions leading up to the signing of the Agreement included no suggestion that the compression clause would be

16

incorporated.  They also observe that Brown accepted payments based on an annual rate of $87,780 throughout FY05 without making any suggestion that he was entitled to an adjustment under the compression clause.  This evidence, the WNESU Defendants suggest, rules out the possibility that Brown's interpretation of the Agreement is a reasonable one.

It is true that "[i]n determining whether a contract is ambiguous, the court may consider evidence of the circumstances surrounding the making of the contract." Morrisseau v. Fayette, 164 Vt. 358, 366, 670 A.2d 820, 826 (1995).  The WNESU Defendants misperceive the role of this doctrine, however.  Morrisseau and its predecessor cases merely recognize that the court may rely on evidence of surrounding circumstances to find ambiguity in a contract that appears unambiguous when viewed in isolation.  See Isbrandtsen, 150 Vt. at 579, 556 A.2d at 84 ("Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable.").  Nothing in this line of cases permits a court to use extrinsic evidence to rule out an otherwise reasonable interpretation of a contract; such a task is the exclusive province of the jury.  Accordingly, even if the evidence cited by the WNESU Defendants might bolster the reasonableness of their interpretation, it cannot render the Agreement unambiguous as a matter of law.

The WNESU Defendants also argue that even if the parties intended the Settlement Agreement to incorporate the compression clause, Henry's unusual salary arrangement was never intended to trigger that clause.  They again highlight the fact that the WNESU issued paychecks based on an annual salary rate of $87,780 for the duration of FY05 and that Brown accepted those checks even though he had been aware of Henry's higher salary even since signing off on her contracts.

This argument is also unpersuasive.  Given the contract's unequivocal statement that "[i]n no event shall the Superintendent's salary be less than 5% high[er] than the next highest salaried employee in the WNESU," Brown's interpretation that Henry's salary would trigger an adjustment is reasonable. It may be that Brown's delay in seeking a salary adjustment lends support to the WNESU's competing interpretation, but to the extent that this gives rise to an ambiguity in the contract, that would merely present an issue of fact for a jury to decide.

In short, because Brown's interpretation of the Settlement Agreement and the compression clause is reasonable, there are issues of fact as to whether the WNESU complied with its obligation under the Agreement to pay Brown's "full salary."

**B. Whether there was a sufficiently material breach to excuse Brown's performance**

In addition to presenting evidence that the WNESU breached the Settlement Agreement, Brown must also raise an issue of fact as to whether the alleged breach went to the essence of the contract. Rioux, 47 A. at 408. In resolving this issue, "[t]he test is whether the matter, in respect to which failure of performance occurs, is of such nature and such importance that the contract would not have been made without it." 26 Williston on Contracts § 68:2 (4th ed.).

The WNESU Defendants argue that even if Brown's position regarding the compression clause is accepted, there cannot have been a breach going to the essence because the WNESU substantially performed its obligations under the Agreement. The post-resignation payments made on Brown's behalf totaled $34,558.01, they note, and the adjustment he requested pursuant to the compression clause would only have amounted to an additional $6,720. Because the latter sum is a relatively small percentage of the total compensation, the WNESU Defendants argue, the WNESU's failure to pay the adjustment cannot be deemed to go to the essence of the Agreement.

Brown submits a different calculation of the cost of the WNESU's alleged breach. Because the State Teachers Retirement System bases his pension payments on his past salary level, he argues, the WNESU's failure to grant his request for a salary

19

adjustment has irrevocably affected his future retirement income.
Without discussing the precise manner in which his pension is
calculated, Brown asserts in his affidavit that the WNESU's
alleged breach of the Agreement will cost him approximately
$27,000 in future pension payments.  By combining this figure
with the $6,720 in direct payments he seeks under the compression
clause, he estimates that he has been denied approximately
$35,000 in consideration, which by his calculation is over half
of the total consideration to which is entitled.  See Brown Aff.
¶ 26.  He further submits that this sum was "the most important
part" of the consideration he bargained for because it affected
his retirement income.  Id.

Resolving all ambiguities and drawing all inferences in
Brown's favor, the Court concludes that Brown has raised an issue
of fact as to whether there was a breach going to the essence.
Based on the information provided in his affidavit, it is
apparent that if his definition of "full salary" ultimately
prevails, he will have been deprived of a large proportion of the
financial benefit he was entitled to receive.  To be sure, it
would have been helpful for Brown to submit additional evidence
regarding the manner in which his pension is calculated.
However, given that Brown is an experienced Vermont education
professional with a 27-year background in the field, his
understanding of the effect of salary levels on his pension
payments can be relied upon at this stage of the case.

20

As the WNESU Defendants correctly note, Brown must show not only that the alleged breach deprived him of substantial benefits, but also that he would not have entered into the Settlement Agreement without the expectation of those benefits. In the view of the WNESU Defendants, Brown has failed to provide evidence that he was aware, at the time he signed the Agreement, of his alleged entitlement to the compression clause adjustment and of the effect of that adjustment on his retirement income.

Contrary to this suggestion, Brown has provided sufficient evidence that when he entered into the Agreement, he knew of the additional consideration he now claims to be owed.  As the WNESU Defendants themselves point out, Brown was plainly aware of Henry's salary, since he had personally signed off on both her original contract and the addendum that caused her salary to exceed Brown's own.  Brown's affidavit also demonstrates that he had knowledge of the compression clause mechanism in his contract.  Although it is true that he did not seek a salary adjustment at the time he was receiving his FY05 salary payments, that conduct was consistent with his stated practice of waiting to make compression clause adjustment requests until "the end of the year in question."  Id. ¶ 23.  Taken together, these facts support an inference that Brown was aware of his potential claim to a compression clause adjustment based on Henry's salary, and that he believed this adjustment to be included in the "full salary" for which he bargained in the Settlement Agreement.

21

There is also no reason to doubt that Brown was aware that a higher salary would affect his pension, given his experience in the educational system and his statement that the effect on his retirement income was "the most important part" of the consideration for which he was bargaining.  Id. ¶ 26.

For these reasons, Brown has raised an issue of fact as to whether the WNESU committed a breach that went to the essence of the Agreement.  The Court cannot conclude as a matter of law that the Settlement Agreement bars Brown from bringing this action; consequently, the WNESU Defendants' motion for summary judgment must be denied.

## II. <u>THE INDIVIDUAL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

The Court now turns to the motions for summary judgment filed by the Individual WNESU Defendants and by Lynn.  Because the analysis of Brown's claims is substantially similar for each of the individual defendants, the court considers the two motions together.  The individual defendants' primary arguments are (1) that Brown's claims against them are unavailing in light of his voluntary resignation; (2) that they are entitled to qualified immunity; and (3) that Brown's due process rights were satisfied by the availability of postresignation remedies.

## A. <u>Whether Brown's claims against the individual defendants are barred by the fact that he voluntarily resigned</u>

All of the individual defendants raise the voluntariness of Brown's resignation as a defense to his claims against them.  As

discussed in greater detail in Section A.2 below, if Brown's resignation was voluntary, there is no basis for his claims that he was deprived of his procedural due process rights and his rights under state law.  Brown denies that he resigned voluntarily, arguing instead that the defendants' actions amounted to a constructive discharge.

1. <u>Whether Brown's resignation was voluntary</u>

An employee who resigns is presumed to have done so voluntarily.  <u>Leheny v. City of Pittsburgh</u>, 183 F.3d 220, 227 (3d Cir. 1999); <u>Hargray v. City of Hallandale</u>; 57 F.3d 1560, 1568 (11th Cir. 1995); <u>Angarita v. St. Louis County</u>, 981 F.2d 1537, 1544 (8th Cir. 1992).  To overcome this presumption, the employee must present "sufficient evidence to establish that the resignation was involuntarily extracted." <u>Hargray</u>, 57 F.3d at 1568.  Courts have identified two categories of employer conduct that can render a resignation involuntary: "(1) where the employer forces the resignation by coercion or duress, or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee[.]"  <u>Id.</u>; <u>accord</u> <u>Leheny</u>, 183 F.3d at 227.

Brown does not allege that his resignation was secured through acts of deception or misrepresentation.  He does, however, suggest that the defendants coerced his resignation.  In evaluating this claim, the question is whether Brown reasonably believed that he "had no other choice but to quit."  <u>Lighton v.</u>

University of Utah, 209 F.3d 1213, 1222 (10th Cir. 2000); see also Pennsylvania State Police v. Suders, 542 U.S. 129, 134 (2004) (holding, in Title VII context, that resignation will be treated as a constructive discharge if the employer creates a hostile work environment that is "so intolerable that a reasonable person would have felt compelled to resign"). To make this determination, courts employ a totality-of-the-circumstances test, considering a number of factors that include: "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel." Hargray, 57 F.3d at 1568; see also Lighton, 209 F.3d at 1222; Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 174 (4th Cir. 1988).

The first and arguably most important factor is whether Brown had an alternative to resignation. Brown argues that he did not; it was intolerable for him to remain in his position, he contends, because it was clear from the defendants' failure to afford him due process rights and their communications to Brown that they had already made up their minds to fire him. To support this claim, he cites a lengthy list of what he characterizes as due process violations by the defendants. Specifically, he argues that he never received notice of the

24

charges against him, a proper hearing, or an opportunity for cross-examination; that the WNESU board never considered his response to Jane Doe's allegations; that various defendants were biased against him or that they failed to disclose conflicts of interest; and that certain defendants engaged in *ex parte* communication with Doe.  He also cites two communications as evidence that the board had made up its mind to terminate him: (1) Lynn's letter of April 29, 2005, which stated that the WNESU intended to dismiss Brown unless he presented evidence on his behalf; and (2) Lynn's e-mail of May 19, 2005, which stated that the WNESU would be pleased to accept Brown's resignation and indicated that if formal action was necessary, the board may vote to terminate him.

Brown's reliance on what he perceives to be procedural errors by the defendants is misplaced.  As an initial matter, a number of his allegations are unsupported by the facts.  For example, while he asserts that he never received notice of the charges against him, it is undisputed that he received copies of the Doe Complaint and the Ritter Report well before the board began meeting to consider his possible termination.[5]  In addition, because Brown resigned before the board's process had run its course, it was premature for him to conclude that he had

---

[5] Brown's complaint that he was not given a copy of the supporting attachments to the Doe Complaint rings hollow in light of his attorney's rejection of Lynn's offer to make the entire document, including attachments, available to him.

25

been denied all the process he was due.  For example, Brown could

not say with any certainty that he would not have received a

proper hearing, because his resignation deprived the defendants

of an opportunity to hold one.  See Finley v. Giacobbe, 79 F.3d

1285, 1296 (2d Cir. 1996) ("[Plaintiff] cannot complain of

procedural defects and omissions, because she resigned before her

employer took all the steps necessary to fire her.").

More fundamentally, the defendants' communications with

Brown make it clear that resignation was not presented as his

only alternative.  Although Lynn's April 29 letter indicated that

the board intended to pursue termination, Lynn expressly stated

that Brown was entitled to a pretermination hearing, and he

invited Brown to present evidence and arguments in his defense.[6]

Nor did the May 19 e-mail contain any suggestion that termination

was inevitable; instead, it recommended resignation and merely

stated that it was the sense of the board chairman that

otherwise, "there *may* be a vote to terminate." (emphasis added).

Courts have consistently held that even a plaintiff

threatened with possible or probable termination has a viable

alternative to resignation: "the fact remains that plaintiff had

_____

[6] Although Brown cites the April 29 letter as evidence that the
defendants improperly shifted the burden of proof to him, this
contention is unpersuasive.  The undisputed facts demonstrate
that the WNESU had received, in the form of the Ritter Report,
evidence that Brown had violated WNESU policy.  For this reason,
it was not improper for Lynn to suggest that the burden had now
shifted to Brown to rebut the Ritter Report's findings.

a choice.  [Plaintiff] could stand pat and fight."  <u>Hargray</u>, 57

F.3d at 1568 (quoting <u>Christie v. United States</u>, 518 F.2d 584,

587 (Ct. Cl. 1975)).  As the Fourth Circuit has put it,

> the mere fact that the choice is between comparably
> unpleasant alternatives . . . does not of itself establish
> that a resignation was induced by duress or coercion,
> hence was involuntary.  This is so even where the only
> alternative to resignation is facing possible termination
> for cause, unless the employer actually lacked good cause
> to believe that grounds for termination existed.[7]

<u>Stone</u>, 855 F.2d at 174; <u>see also</u> <u>Christie</u>, 518 F.2d at 587

("Merely because plaintiff was faced with an inherently

unpleasant situation in that her choice was arguably limited to

two unpleasant alternatives does not obviate the voluntariness of

her resignation.").

   Accordingly, even if Brown felt that the process being

afforded him was unfair and that termination was likely, it would

nevertheless have been clear to a reasonable person in his

position that he had at least two valid options: to negotiate his

resignation, or to "stand pat and fight."  The first factor thus

---

[7] The last clause of the quoted passage provides for an exception
where the employer lacked good cause to believe that grounds for
termination existed.  In this case, Brown has failed to present
evidence of a lack of good cause on the board's part.  The board
was plainly entitled to its reasonable belief that grounds for
termination existed in light of the conclusion of Ritter, an
independent investigator, that Brown had violated the WNESU's
sexual harassment policy.  Although Brown cites a number of cases
in which particular behavior by employers was not deemed to
constitute sexual harassment, those cases addressed the entirely
distinct issue of whether the complaining employee had cause to
sue, not whether the supervisor's conduct was cause for
termination.

weighs in favor of a finding that his resignation was voluntary.

The remaining factors require less extensive discussion. With regard to the second factor, there is no evidence that Brown lacked comprehension of the nature of the choice he was given, and he does not argue otherwise.  Not only was Brown an experienced education professional with 27 years in the field, but his communications with the defendants, many of which were transmitted via counsel, demonstrated his understanding of the situation.  Accordingly, this factor weighs in favor of voluntary resignation.

The third factor--whether Brown was given a reasonable amount of time to make his decision--arguably weighs to a certain degree in the opposite direction.  Although the discussions between Brown and the defendants took place over a period of weeks, Lynn's May 19 e-mail did recommend that Brown make a decision within the relatively short time frame of 24 hours.

The fourth factor is whether Brown was permitted to select the effective date of the resignation.  Although Brown agreed to step down immediately, he negotiated a settlement under which he would continue receiving his salary for nearly four months.  This fact is of particular note given that Lynn had previously suggested, in his May 19 e-mail, that the board would be unwilling to consider a buyout of Brown's contract.  The Court thus finds that the negotiated settlement indicates a substantial degree of voluntariness.

Finally, the fifth factor, the presence of counsel, weighs in favor of a voluntary resignation. Brown was represented by Faignant throughout the proceedings, Faignant was an active participant in the settlement negotiations, and the two were able to consult before Brown made his final decision.

Taking all of these factors into account, the Court concludes that no reasonable jury could find that Brown's resignation was coerced. Although he may not have been satisfied with the process leading up to his resignation, it was made clear to Brown that he had a choice between resigning or fighting his termination to the end. He was represented by counsel at all relevant times, and he was able to negotiate a settlement that ensured he would continue to receive over $30,000 in additional payments in the months following his resignation. It is also important to note that Brown accepted these payments and made no indication that he considered his resignation to have been involuntary until he filed the instant lawsuit.

The only factor that could be construed as casting doubt on the voluntariness of Brown's resignation is the fact that he was asked to reach a decision whether to resign within a 24-hour period. Standing alone, however, this factor is insufficient to create an issue of material fact as to the voluntariness of a resignation. See, e.g., Hargray, 57 F.3d at 1570 (concluding that plaintiff must demonstrate "circumstances much more coercive" than time pressure and lack of an attorney); Stone, 855

F.2d at 177 (downplaying issue of time pressure in light of plaintiff's decades of experience in the field and fact that he had driven a "hard bargain" that included severance pay and a clean record).  In addition, Brown had several weeks leading up to the final decision in which he was able to consider the issue.

For these reasons, the Court concludes that Brown has failed to overcome the presumption that his resignation was voluntary.

2. <u>The effect of Brown's voluntary resignation on his claims</u>

Having concluded that Brown resigned voluntarily, the Court now proceeds to consider the effect of his resignation on each of his claims against the individual defendants.

(a) *Count II (Interference with contract)*

Count II alleges that the individual defendants "wrongfully interfered with Plaintiff's employment contract with the WNESU and directly resulted in the constructive termination of Plaintiff's employment."  Am. Compl. ¶ 74.  Under Vermont law, to prevail on a claim of interference with a contractual relationship, Brown must establish that "the defendant . . . intentionally and improperly induced or caused [the WNESU] not to perform under [its] contract with the plaintiff."  <u>Kollar v. Martin</u>, 167 Vt. 592, 593, 706 A.2d 945, 946 (1997); <u>see also Howard Opera House Assocs. v. Urban Outfitters, Inc.</u>, 166 F. Supp. 2d 917, 930 (D. Vt. 2001).

As <u>Kollar</u> makes clear, an essential element of Brown's contractual interference claim is that the WNESU failed to

perform its obligations under the employment contract.  In light of the Court's conclusion that Brown voluntarily resigned and terminated his contract, Brown cannot establish an issue of material fact as to whether the WNESU failed to perform.  See, e.g., Hawkins v. Deruyter, No. A03-1176, 2004 WL 1328008, *2 (Minn. App. June 15, 2004) ("Because Hawkins voluntarily left his position at Minnesota ABC, and because he cannot prove he was constructively discharged from Minnesota ABC, he cannot prove the third element of his claim for tortious interference with contract--that [defendants] procured the breach of his employment contract.").  Accordingly, the individual defendants are entitled to summary judgment on Count II.

    (b) *Count IV (42 U.S.C. § 1983)*

    Count IV alleges that the defendants, "acting under color of state law, violated Plaintiff's rights and privileges as set forth in [42] U.S.C. § 1983."  Am. Compl. ¶ 78.  The Amended Complaint does not specify which rights Brown alleges to have been denied.  However, he has subsequently made clear that the Section 1983 claim and the other counts asserting constitutional violations are based solely on a theory of procedural due process.[8]

---

[8] Brown's counsel, Mr. Faignant, confirmed this position at a status conference held on May 19, 2006.  In addition, Brown's submissions to the Court make clear that the constitutional violation he alleges is a denial of his procedural due process rights.

It is well established that if a public employee voluntarily resigns, the employer has not deprived him of a property interest, and therefore there is no basis for a procedural due process claim. See Stone, 855 F.2d at 173 n.7 (stating that when a public employee resigns, "procedural due process is not implicated" because "he has suffered no deprivation at the hands of the state"); see also Finley, 79 F.3d at 1296 ("[W]here the alleged illegality is the employer's failure to afford the employee legally required procedural protections, and the employee voluntarily resigns before being discharged, the resignation effectively deprives the employer of the opportunity to comply with the procedural obligations and forecloses the employee from seek[ing] the protections of her previous rights as an employee.") (alteration in original).  Because Brown voluntarily resigned before he could be terminated, there is no basis for his procedural due process claim, and the individual defendants are entitled to summary judgment on Count IV.

(c) *Count V (Conspiracy)*

Count V, which is entitled "conspiracy to violate due process rights," alleges that the defendants, "acting individually and in concert with each other, and others, conspired to and in fact did violate Plaintiff's contractual statutory and constitutional due process rights."  Am. Compl. ¶ 80.  As the caption of the count suggests, Brown appears to be relying on a theory of violation of procedural due process rights

32

as the basis for this claim, and he does not suggest otherwise in his memoranda.

A claim of conspiracy to violate constitutional rights differs from an ordinary Section 1983 claim in that it may be brought against private individuals.[9]  Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995).  Nevertheless, such an action "will stand only insofar as the plaintiff can prove the sine qua non of a § 1983 action: the violation of a federal right."  Id.; see also Young v. County of Fulton, 160 F.3d 899, 904 (2d Cir. 1998 (holding that where "[t]here was no deprivation of a federal constitutional right, . . . there can be no civil rights conspiracy to deprive that right").

For this reason, Brown's failure to establish an issue of material fact with regard to whether his due process rights were violated, as discussed under Count IV above, is fatal to his conspiracy claim.  The individual defendants are entitled to summary judgment on Count V.

_____

[9] In his motion for summary judgment, Lynn correctly notes that a Section 1983 conspiracy claim cannot allege a conspiracy that is entirely between private individuals.  See Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (holding that conspiracy must be based on "an agreement between two or more state actors or between a state actor and a private entity").  Lynn goes on to suggest that the conspiracy alleged by Brown involved only two private individuals: Lynn and Vincent.  Contrary to this assertion, however, the Amended Complaint makes clear that in Brown's view, *all* of the individual defendants, including the six public officials, conspired to violate his rights.  See, e.g., Am. Compl. ¶ 32.  This particular argument must therefore be rejected.

(d) *Counts VI, VII, and XIII (Claims of deprivation of "contractual, statutory, and constitutional rights" and "well established rights")*

Count VI alleges that the defendants "violated Plaintiff's contractual, statutory, and constitutional rights."  Am. Compl. ¶ 82.  Count VII alleges that the individual defendants "violated Plaintiff's well established rights, of which [they] had actual knowledge, and for that reason they are personally libel [*sic*] to Plaintiff in their individual capacities."  Id. ¶ 84.  Count XIII alleges that the defendants "used the executive session privilege to fraudulently deprive Plaintiff of his contractual, statutory and constitutional rights."  Id. ¶ 96.

Although none of the three counts identifies the specific rights that are alleged to have been deprived, they appear to rely on the same theories of interference with contract and violation of procedural due process rights that formed the basis for Counts II and IV, and Brown makes no assertion to the contrary.  Accordingly, for the reasons already discussed in connection with Counts II and IV, the individual defendants are entitled to summary judgment on Counts VI, VII, and XIII.

(e) *Counts not dependent on a showing of involuntary resignation (Counts XII, XIIII, and XV)*

Count XII alleges that punitive damages are warranted against the defendants.  Id. ¶ 94.  Count XIIII alleges that the defendants "wrongfully denied Plaintiff defense and indemnity pursuant to 16 V.S.A. § [1756] and are therefore libel [*sic*] for

the attorney fees incurred by Plaintiff in defending himself."
Id. ¶ 98.  Count XV alleges that defendants Lynn and Vincent
violated duties of good faith and fair dealing.  Because none of
these counts necessarily depends on a showing by Brown that his
resignation was involuntary, they are discussed separately, in
the following section.

## B. **Brown's claims for attorneys' fees, good faith and fair dealing, and punitive damages**

The Court next turns to the three remaining counts that
assert claims against the individual defendants: Counts XII,
XIIII, and XV.  Because Count XII is a punitive damages claim
that is merely derivative of the other counts in the Amended
Complaint, the Court turns first to the other two counts.

### 1. Count XIIII (Attorneys' fees)

Count XIIII alleges that the defendants "wrongfully denied
Plaintiff defense and indemnity pursuant to 16 V.S.A. § [1756][10]
and are therefore libel [*sic*] for the attorney fees incurred by
Plaintiff in defending himself."  Am. Compl. ¶ 98.  Section 1756
provides, in relevant part,

> A town, city, incorporated or union school district and a
> supervisory union, shall indemnify and save harmless to
> the extent of the policy limits provided in subsection (b)
> of this section, any person employed by the school

---

[10] Although the caption of Count XIIII refers to "16 V.S.A. §
1756," the text contains an apparent typographical error,
referring to "16 V.S.A. § 1759."  Given that there is no Section
1759 in that title of the Vermont statutes, it is obvious that
Brown intended to invoke Section 1756, as indicated by his
caption.

district and any member of its executive, supervisory or
administrative staff, including without limitation members
of the board of school directors of the district, from
financial loss and expense, including reasonable legal
fees and costs, if any, *arising out of any claim, demand,
suit or judgment by reason of alleged negligence or other
act resulting in accidental injury to a person or
accidental damage to or destruction of property*, within or
without the school building, provided such indemnified
person at the time of the accident resulting in such
injury, damage or destruction, was acting in the discharge
of his duties within the scope of his employment or under
the direction of the board of school directors or the
supervisory union board of directors as the case may be.

Vt. Stat. Ann. tit. 16, § 1756(a) (emphasis added).  As the

highlighted text indicates, Section 1756 only requires school

district employees to be indemnified for expenses arising out of

allegations of accidental personal injury or property damage.[11]

Because Brown has presented no evidence to suggest that the

present action is in any way connected with accidental injury or

property damage, Count XIIII is frivolous and must be dismissed.

2. Count XV (good faith and fair dealing)

Count XV alleges that the conduct of Vincent and Lynn "was a

breach of their and VSBIT's and ASC's duty of good faith and fair

dealing with Plaintiff."  Am. Compl. ¶ 100.  Because only Lynn's

motion for summary judgment seeks dismissal of this count, the

Court will only consider the validity of this claim with respect

---

[11] In addition, there is nothing in the statute or the case law
to suggest that an action under Section 1756 may be brought
against an individual.

to Lynn, not Vincent.[12]

"The implied covenant of good faith and fair dealing exists
to ensure that parties to a contract act with 'faithfulness to an
agreed common purpose and consistency with the justified
expectations of the other party.'" Carmichael v. Adirondack
Bottled Gas Corp., 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993)
(quoting Restatement (Second) Contracts § 205 cmt. a (1981)).  As
this definition makes clear, the implied covenant of good faith
and fair dealing arises only between parties to a contract.  See
Peerless Ins. Co. v. Frederick, 177 Vt. 441, 446 869 A.2d 112,
116 (2004) ("[T]he duty of good faith and fair dealing arises
solely because of the presence of the . . . contract."); In re
Houbigant Inc., 914 F. Supp. 964, 994-995 (S.D.N.Y. 1995)
(declining to impose "a duty of good faith and fair dealing on a
party who is not a party to the particular contract").  Brown has
presented no evidence, however, that Lynn was a party to any
contract that would give rise to a duty of good faith and fair
dealing.

Count XV also asserts that Lynn violated a duty of good
faith and fair dealing owed by VSBIT and ASC.  Some courts have
held that such a duty may extend not only to parties to the

---

[12] The motions and memoranda in which Vincent has joined make no
reference to Count XV.  Should Vincent choose to file his own
motion with respect to Count XV, however, he would likely be
entitled to summary judgment for the same reasons that Lynn has
put forward.

contract, but also to agents acting on behalf of those parties.
See, e.g., Citizens Comm'ns Co. v. Trustmark Ins., 303 F. Supp.
2d 197, 208 (D. Conn. 2004) ("As the agent of a party who had a
duty of good faith based on a contract, [defendant] also
effectively had such a duty in its interactions in the
contractual relationship."). However, even assuming that Vermont
courts would follow the same rule, it would be of no assistance
to Brown. Because there is no indication that Brown was in
contractual privity with either VSBIT or ASC, neither of those
entities owed him a duty of good faith and fair dealing. For
these reasons, Lynn is entitled to summary judgment on Count XV.

   3. Count XII (punitive damages)

      Count XII asserts that Brown is entitled to punitive
damages. Because this claim is derivative of the other counts in
the Amended Complaint, and because all remaining counts have been
dismissed with respect to defendants Dufresne, Randall, Dufort,
Lawrence, Stevens, and Capron, those defendants are entitled to
summary judgment on Count XII. See, e.g., John and Jane Doe 2 v.
Ortho-Clinical Diagnostics, Inc., 335 F. Supp. 2d 614, 630
(M.D.N.C. 2004) ("[B]ecause the Court has dismissed all of
Plaintiffs' actual causes of action against [defendant], the
Court must also dismiss Plaintiffs' 'claim' against [defendant]
for punitive damages.").

      Because the Court has not dismissed Count XV with respect to
Vincent, and because Vincent has not presented any other argument

why punitive damages would be unwarranted, it would be premature to dismiss Count XII against him at this time.  The Court expresses no opinion as to whether punitive damages would actually be available in the event that Brown prevails against Vincent on Count XV.

## C. **Qualified immunity**

The individual defendants also argue that Brown's claims against them are barred by the doctrine of qualified immunity. This doctrine protects public officials from liability arising out of the performance of their discretionary official duties "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Demoret v. Zegarelli, 451 F.3d 140, 148 (2d Cir. 2006).  Because the applicability of qualified immunity varies as to the school board defendants, on one hand, and private citizens Lynn and Vincent, on the other, the Court considers the two groups of defendants in turn.

### 1. The school board defendants

The Court has already determined that the defendants who are school board members, i.e., Dufresne, Randall, Dufort, Lawrence, Stevens, and Capron, are entitled to summary judgment because Brown has failed to demonstrate that they violated his rights. As discussed briefly below, qualified immunity provides additional protection to these defendants.

As school board members, the six WNESU board members fell

within the class of "public officials" who are entitled to assert qualified immunity.  See, e.g., Morris-Hayes v. Bd. of Educ. of Chester Union Free School Dist., 423 F.3d 153, 158 (2d Cir. 2005).  Because this threshold requirement is satisfied, the Court must conduct a two-step analysis to determine whether qualified immunity is warranted on the facts of the case.  First, it must determine "whether, construing the evidence in the light most favorable to [the plaintiff], there is a genuine issue of material fact as to whether the defendants violated [plaintiff's] constitutional rights."  Huminski v. Corsones, 396 F.3d 53, 80 (2d Cir. 2005).  If this step is resolved in the plaintiff's favor, the court "must then address the extent to which the right may have been clearly established at the time of the defendants' acts in question."  Id.  "A defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law."  Demoret, 451 F.3d at 148.

As discussed in section A above, the Court has resolved the first step in favor of the school board defendants, concluding that Brown has failed to demonstrate a violation of his rights. Even if this were not the case, however, the school board defendants would prevail on the second step, because there is no evidence that they acted unreasonably.  They were aware that Brown, represented by counsel, had engaged in extensive

negotiations and that he had signed the Settlement Agreement and the document entitled "Resignation and Termination of Contract." Particularly in light of the substantial concessions that Brown obtained in the course of the negotiations, a reasonable person in the board members' position would have concluded that Brown had voluntarily resigned, and therefore that his due process and contractual rights had not been violated.  For these reasons, qualified immunity provides additional support for the dismissal of Brown's due process and contract-related claims against the school board members.

    2. <u>Defendants Lynn and Vincent</u>

While the school board members are plainly public officials who are entitled to qualified immunity, it is less clear that the doctrine applies to Lynn and Vincent.  Private individuals are not ordinarily entitled to qualified immunity.  <u>See</u> <u>Toussie v. Powell</u>, 323 F.3d 178, 183 (2d Cir. 2003) ("[A] private defendant faced with § 1983 liability for conspiring with state officials to violate federal rights is not protected by the doctrine of qualified immunity.").

Although an exception to the rule stated in <u>Toussie</u> may exist if there are "special reasons significantly favoring an extension of governmental immunity" to a private defendant, <u>Richardson v. McKnight</u>, 521 U.S. 399, 412 (1997), it is unnecessary to explore this possibility in the case of either Lynn or Vincent.  Because Lynn is already entitled to dismissal

of all claims against him, the Court finds no need to engage in the complex analysis that would be required to evaluate his entitlement to qualified immunity.  Vincent, for his part, has failed to present any argument why qualified immunity might apply notwithstanding his status as a private citizen; accordingly, he must be deemed to have waived any protection that the doctrine might have afforded him.

D. **Whether the availability of postdeprivation proceedings provided Brown with adequate due process**

Finally, even if Brown's resignation had not been voluntary, and even leaving aside questions of qualified immunity, the due process claims would be subject to dismissal on an additional ground.  In the unusual situation presented here, i.e., where an employee resigns and subsequently claims that the decision was coerced, the employee is barred from bringing a due process challenge to the procedures that preceded his resignation as long as he was afforded a meaningful postresignation remedy.  Giglio v. Dunn, 732 F.2d 1133, 1134-35 (2d Cir. 1984); Semorile v. City of New York, 407 F. Supp. 2d 579, 582-83 (S.D.N.Y. 2006).

When the state deprives an individual of life, liberty, or property, it must abide by the "fundamental requirement of the Due Process Clause . . . that [the] individual be given the opportunity to be heard at a meaningful time and in a meaningful manner."  Patterson v. City of Utica, 370 F.3d 322, 336 (2d Cir. 2004).  Under ordinary circumstances, the deprivation must "be

42

preceded by notice and opportunity for hearing appropriate to the nature of the case." O'Connor v. Pierson, 426 F.3d 187, 197 (2d Cir. 2005).  However, if it would be "impractical" to hold a predeprivation hearing, it is sufficient for the state to supply a meaningful post-deprivation remedy.  Giglio, 732 F.2d at 1135; see also Parratt v. Taylor, 451 U.S. 527, 539 (1981) ("[T]he impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.").

In Giglio, the Second Circuit held that allegedly coerced resignations fall into the category of situations in which a predeprivation hearing would be impractical: "A coerced resignation does not involve a showing of cause; it is simply the submission by an employee to pressure exerted by a superior. For this reason, it is hard to visualize what sort of prior hearing the Constitution would require the employer to conduct." Giglio, 732 F.2d at 1135.  For this reason, the court held, a plaintiff receives all the process he is due as long as the state provides "a meaningful opportunity to challenge the voluntariness of his resignation" after the fact.  Id.  In Giglio itself, because the plaintiff could have challenged his resignation under Article 78 of the New York Civil Practice Law, the court upheld the dismissal of his challenge to the process he had received prior

to resigning.

In Vermont, the analog to New York's Article 78 is Rule 75 of the Vermont Rules of Civil Procedure.  Subject to certain exceptions not relevant here, that Rule provides that "[a]ny action or failure or refusal to act by an agency of the state or a political subdivision thereof, including any department, board, commission, or officer . . . may be reviewed in accordance with this rule if such review is otherwise available by law."  Vt. R. Civ. P. 75.  This mechanism "provides a procedure applicable whenever county court review is provided by the particular statute establishing an agency or is available as a matter of general law by proceedings in the nature of certiorari, mandamus, or prohibition."  Reporter's Notes to Vt. R. Civ. P. 75.  As such, Rule 75 is directly analogous to New York's Article 78. See N.Y. C.P.L.R. 7801 ("Relief previously obtained by writs of certiorari to review, mandamus or prohibition shall be obtained in a proceeding under this article.").

School boards are among the entities whose actions may be reviewed under Rule 75.  See, e.g., Rouleau v. Williamstown School Bd., 892 A.2d 223, 2005 VT 131 (2005) (reviewing school board disciplinary action); Burroughs v. West Windsor Bd. of School Directors, 141 Vt. 234, 446 A.2d 377 (1982) (reviewing school board's decision not to renew teacher's contract). Accordingly, just as the plaintiff in Giglio had a meaningful postdeprivation remedy under Article 78, Brown had an adequate

remedy in the form of Rule 75.

Brown disputes the notion that the availability of Rule 75 relief provided him with adequate due process, arguing that such a conclusion would run counter to two decisions of the United States Supreme Court.  First, he argues that <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532 (1985) establishes that an after-the-fact hearing fails to satisfy the requirements of due process.  In that case, the Supreme Court held that "some form of pretermination hearing" is required before a tenured public employee may be discharged for cause.  <u>Loudermill</u>, 470 U.S. at 542.

<u>Loudermill</u> does not speak to the issue at hand, however.  In the case of a termination, the key dispute is whether the employer has cause to terminate the employee, and it is ordinarily practicable to conduct a pretermination hearing into that issue.  By contrast, a resignation differs from a termination in that it "is not a unilateral act on the part of the employer, and . . . it does not purport to be for cause."  <u>Giglio</u>, 732 F.2d at 1134.  For this reason, "the only possible dispute is whether the resignation was voluntary or involuntary, and this cannot be determined in advance."  <u>Id.</u> at 1135.  Because <u>Loudermill</u> simply did not address the situation of an allegedly coerced resignation, nothing in that case disturbs the doctrine of <u>Giglio</u>.

Second, Brown argues that dismissing his claims based on the

45

availability of Rule 75 relief would violate the doctrine of
Patsy v. Board of Regents of State of Florida, 457 U.S. 496
(1982), which held that exhaustion of state administrative
remedies is not required as a prerequisite to bringing an action
pursuant to 42 U.S.C. § 1983.  Patsy, 457 U.S. at 516; see also
Steffel v. Thompson, 415 U.S. 452 (1974) (reaching the same
conclusion with respect to state judicial remedies).

Brown's position reflects a misunderstanding of the
relationship between the doctrines of Patsy and Giglio.  Patsy
merely holds that as a *procedural* matter, a court must entertain
a Section 1983 claim even if the plaintiff did not exhaust state
law remedies.  Giglio holds that when the court proceeds to
entertain the claim, it must dismiss the claim *on the merits* if
the claim was based on procedural due process and if the state
law remedies were adequate.  This distinction has been made clear
by the Second Circuit in rejecting an argument similar to the one
raised here by Brown.  See Campo v. New York City Employees' Ret.
Sys., 843 F.2d 96 (2d Cir. 1988).  Relying on Giglio, the Campo
court upheld the dismissal of the plaintiff's Section 1983
procedural due process claim because New York's Article 78 had
provided an adequate remedy.  The court stated:

> Our conclusion does not offend the doctrine of
> nonexhaustion of state remedies set forth in [Patsy] and
> [Steffel].  Mrs. Campo has asserted only one claim under
> federal law, i.e., denial of procedural due process
> pursuant to the Fourteenth Amendment.  Mrs. Campo has not
> been required first to present and to exhaust that
> contention in a state court.  Rather it has been

46

> entertained--and decided against her--in this federal case
> because [the process made available to her under state law
> was adequate].

Id. at 103; see also Nocera v. New York City Fire Comm'r, 921 F.
Supp. 192, 202 n.5 (S.D.N.Y. 1996) ("The plaintiff is not
required to exhaust state remedies but, if there are adequate
state remedies, the plaintiff cannot complain that he was denied
procedural due process[.]").

For these reasons, even if Brown was coerced into resigning,
his argument that the defendants violated his procedural due
process rights must fail because he had a meaningful
postdeprivation remedy under Vt. R. Civ. P. 75.  The Court
stresses that its holding is limited to the facts of this case,
and that Rule 75 would not necessarily serve as a meaningful
remedy outside of the particular context presented here.
Nevertheless, the counts that rely on a procedural due process
theory are subject to dismissal on this additional ground.

## CONCLUSION

For the foregoing reasons, the motion of defendants WNESU,
Dufresne, Randall, Dufort, Lawrence, Stevens, Capron, and Vincent
(Doc. 39) is DENIED.  The motion of defendants Dufresne, Randall,
Dufort, Lawrence, Stevens, Capron, and Vincent (Doc. 56) is
GRANTED IN PART and DENIED IN PART; all counts are dismissed as
to those defendants, except that Counts XII and XV are not
dismissed with respect to defendant Vincent.  The motion of

defendant Lynn (Doc. 59) is GRANTED; all counts are dismissed as to defendant Lynn.


Dated at Burlington, Vermont this 31st day of August, 2006.


/s/ William K. Sessions
William K. Sessions III
Chief Judge